**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
                                    :
DAWN PERSECHINO,                    :
                                    :
   plaintiff,                       :
                                    :
v.                                  :   CASE NO. 3:19cv01641 (RAR)
                                    :
UNITED SERVICES, INC.               :
                                    :
   defendant.                       :
```

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dawn Persechino ("Plaintiff") brought suit against her employer, United Services, Inc. ("Defendant") for disability discrimination and failure to accommodate in violation of the Americans with Disabilities Act. Defendant has moved for summary judgment on both claims (Def.'s Mot. Summ. J., Dkt. #28; Def.'s Mem. Supp. Summ. J., Dkt. #29). Plaintiff has objected to the motion (Pl.'s Mem. Obj. Summ. J., Dkt. #36-1). For the reasons set forth in the opinion below, defendant's motion for summary judgment is GRANTED.

## FACTUAL BACKGROUND

Plaintiff is employed by the defendant as a per diem Adjunct Counselor in the Domestic Violence Program. (Plaintiff's Response to Statement Undisputed Facts, Dkt. #36-2 at ¶2, ¶3.) Plaintiff's responsibilities include providing coverage at

shelters for victims of domestic violence and their children.
(Id. at ¶4.)

Defendant is a non-profit organization that operates two
domestic violence shelters, one in Windham, CT and the other in
Danielson, CT. (Id. at ¶6.) Both shelters are open twenty-four
hours per day, seven days per week.[1] (Id. at ¶6.)  The shelters
take in victims of domestic violence and their children, often
under emergency circumstances, and most of the victims have
nowhere else to turn for help. (Id. at ¶6.) Therefore, having
twenty-four hour per day coverage is critical. (Id. at ¶6.)

To ensure twenty-four hour per day coverage, defendant
assigns employees to work in three shifts. (Id. at ¶7.) The
first shift goes from approximately 7:00 am to 3:30 pm; the
second shift goes from approximately 12:30 pm to 9:00 pm; and
the third shift goes from approximately 8:45 pm to 7:15 am. (Id.
at ¶7.) Because it is the busiest time in the shelters, there is
a three-hour overlap between the first and second shift in the
early afternoon.  (Id. at ¶7.) To ensure twenty-four hour per
day coverage, an employee working a given shift may be "frozen
in" to the next shift if the employee who is scheduled to work

---

[1] Employees are expected to work at both shelters, but defendant
reimburses the employees for travel to the shelter that is not the
employee's "home site." (Id. at ¶7.)

the next shift calls out or fails to show up, or if there is an unfilled vacancy.[2] (Id. at ¶8.)

To determine shift coverage, defendant uses an order of priority system to schedule shifts at the two domestic violence shelters: full-time bargaining unit employees are scheduled first[3], then part-time bargaining unit employees are scheduled, and then adjunct counselors pick from the remaining available shifts. (Id. at ¶13.) Per diem employees have the last pick of shifts and are not guaranteed any minimum number of shifts. (Id. at ¶14.)  A per diem employee is not required to take a particular shift or set number of shifts but is expected to take at least two shifts per month to remain on the payroll. (Id. at ¶15.)  Per diem employees may pick up as many shifts as they want, depending on their availability. (Id. at ¶15.)  There have been periods of time when most of the shifts available to per diem employees are third shifts, including in early 2017. (Id. at ¶16.)

---

[2] In Plaintiff's Rule 56(a)(2) Statement, plaintiff admits that defendant sometimes told employees they were frozen into a shift but denies that defendant had to freeze employees into a shift. (Dkt. #36-2 at ¶8.)  In support of this partial denial, Plaintiff relies on a job advertisement from August of 2017. The Court will discuss the job advertisement in the legal section of this decision.

[3] The full-time bargaining unit employees have regularly scheduled shifts and are guaranteed forty hours per week. (Id. at ¶13.)

Defendant uses a call rotation list to determine the order in which per diem employees are offered shifts. If a per diem employee is listed first in the rotation, he or she will be called first, but the next time calls are made for coverage, he or she will be called last.[4] (Id. at ¶17.)  No preference is given to any per diem employee. (Id. at ¶17.)  Schedule limitations and seniority do not matter. (Id. at ¶17.)  The per diem employee who is called first can select as many available shifts as he or she wants. (Id. at ¶17.)  Defendant uses the same call rotation whenever there is a vacancy in the schedule. (Id. at ¶18.)

Plaintiff was hired by defendant as a per diem Adjunct Counselor in the Domestic Violence Program in December of 2011. (Id. at ¶2, ¶3.)  There is a job description for the position of per diem Adjunct Counselor. (Dkt. #30-3 at 1.)  Page one of the job description contains a section titled "**ESSENTIAL FUNCTIONS.**" (Dkt. #30-3, p. 1)(bold print and all caps appearing in original). The first paragraph in that section states "[p]roviding temporary program coverage for hours normally

---

[4] In responding to Defendant's Rule 56(a) statement, plaintiff denies some, but not all, of the factual assertions made in paragraph 17. (See Pl.'s Local Rule 56(A)(2) Statement, Dkt. #36-2 at ¶17.) Plaintiff does not deny that defendant uses a call rotation list, or deny how the call rotation list operates. Instead, plaintiff states "that she was not called by Defendant as many times as claimed by Defendant." (Id.) Therefore, although plaintiff denied a portion of paragraph 17, plaintiff has not disputed the specific factual assertions upon which the Court is relying.

covered by a regular employee, which includes availability to work all shifts (1st, 2nd, 3rd), weekends and holidays." (Dkt. #30-3, p. 1; Pl's Response to Def.'s Statement Undisputed Facts, Dkt. #36-2 at ¶11.)  Page two of the job description contains a section titled "Performance and Competency Measures." (Dkt. #30-3, p. 2.)  The second numbered paragraph in that section states "**Essential Job Functions**: Able to perform the essential functions of the job as identified in the job description." (Dkt. #30-3, at 2)(bold print appearing in original.). Plaintiff signed a form acknowledging that she received a copy of the job description. (Dkt. #30-6; Pl's Response to Def.'s Statement Undisputed Facts, Dkt. #36-2 at ¶11.)

Plaintiff suffers from Bipolar II Disorder. (Dkt. #30-12; Dkt. #36-5.) Defendant has been aware of plaintiff's disability since plaintiff was hired in 2011. (Pl's Response to Def.'s Statement Undisputed Facts, Dkt. #36-2 at ¶25.)

Beginning in 2015, plaintiff filled-in at the shelters for some of the shifts covered by Patti-Sue Brown. (Id. at ¶19.) Ms. Brown was a full-time, bargaining unit employee and, as such, Ms. Brown had regularly scheduled shifts on Friday and Saturday from 12:30 to 9:00 p.m. (second shift). (Id. at ¶19.) For several years during the school year, Ms. Brown worked on an educational grant and her second shifts on Fridays and Saturdays were open. (Id. at ¶19.) Although plaintiff covered some of

5

those shifts at the shelter for Ms. Brown, plaintiff had no entitlement to or guarantee of working those shifts. (Id. at ¶20.)  When the period for the educational grant concluded in May of 2017, Ms. Brown returned to her Friday and Saturday shifts. (Id. at ¶20.)  During the period when plaintiff was covering Ms. Brown's shifts, plaintiff's job description did not change. (Id. at ¶21.)  Additionally, during the period when plaintiff was covering Ms. Brown's second shifts, plaintiff could be frozen into the third shift. (Id. at ¶21.) In fact, plaintiff was frozen into the third shift after working the second shift a few times before September 11, 2017. (Id. at ¶9.)

In early 2017, several employees who regularly worked the third shift left the defendant. (Id. at ¶23.) As a result, there were more openings on the third shift. (Id. at ¶23.) Therefore, per diem employees, including plaintiff, worked more third shifts than usual during that period. (Id. at ¶23.)

In July of 2017, plaintiff gave her supervisor, Lauren Peretto, a note from Dr. Stephen Alloy, which stated that "[b]ecause of a serious ongoing medical condition, [plaintiff] cannot safely work 3rd shifts at work." (Id. at ¶31.)  The note prevented plaintiff from working third shifts. (Id. at ¶31.) Defendant did not schedule plaintiff for any third shifts after she submitted the doctor's note. (Id. at ¶31.)

Plaintiff did not ask defendant for an accommodation until
August of 2017. (Id. at ¶30.)  On August 28, 2017, plaintiff met
with Heather Victoria, who was the Division Director of
Intensive Services, Lauren Peretto, who was plaintiff's
supervisor, and Erika King, who was the new Program Manager.
(Id. at ¶36.)  They met to discuss plaintiff's restrictions and
possible accommodations after the submission of the doctor's
note. (Id. at ¶36.) During the meeting, Ms. Victoria explained
that defendant could take plaintiff off third shifts but
defendant would also have to take plaintiff off second shifts to
ensure that plaintiff did not get frozen into third shifts. (Id.
at ¶36.) According to the plaintiff, Ms. Victoria told her that
she would receive fewer hours. (Id. at ¶37.)

Plaintiff and defendant discussed three accommodations,
including: (1) working with additional staff on the second shift
to ensure that plaintiff did not get frozen in to the third
shift;(2) having another staff member on-call during plaintiff's
second shift in case the employee who was scheduled for third
shift called out; and (3) only having plaintiff work first
shifts.[5] (Id. at ¶38.) Ms. Victoria discussed these possible

---

[5] Plaintiff states that she never offered the option of only working
first shifts as an accommodation; plaintiff claims that defendant
offered it first, and plaintiff rejected it because it meant she would
be working fewer hours. (Def.'s Ex. 2 87:18-88:16, Dkt. #30-2.) The
dispute over who offered the accommodation is not material. This will
be discussed in Section B of this decision.

accommodations with Human Resources after the meeting ended. (Id. at ¶38.) The defendant rejected the first and second accommodations that plaintiff proposed and provided plaintiff with an explanation for the rejection. (Id. at ¶41.)   The parties disagree on whether the first two proposed accommodations were reasonable.

Defendant offered plaintiff the opportunity to work as a per diem employee in another department that does not have third shifts, so that plaintiff could work first and second shifts without the risk of being frozen into the third shift. (Id. at ¶40.) However, plaintiff rejected the proposed accommodation outright, stating that she would only work in the Domestic Violence Program. (Id. at ¶40.)

Defendant removed plaintiff from the second and third shifts. (Id. at ¶44.) Plaintiff expressed concern that she might not get enough shifts only working on first shifts and followed up with her physician to see if her physician would allow her to work some third shifts if she was frozen into third shifts. (Id. at ¶45.)   On or about September 11, 2017, plaintiff submitted a second note from Dr. Alloy.  (Id. at ¶47.)   The note stated that plaintiff "has a diagnosis of bipolar disorder.  Disruption of sleep, such as by working third shift is medically contra-indicated for [plaintiff] for that reason." (Id. at ¶47.)   The doctor's note did not change anything in terms of plaintiff's

8

ability to work third shifts. (Id. at ¶48.)  The note made clear that plaintiff could not work any third shifts, including any part of a third shift. (Id. at ¶48.)  Since that time, defendant has only scheduled plaintiff for first shifts. (Id. at ¶49.)

## PROCEDURAL BACKGROUND

In February 2018, plaintiff filed a complaint with the U.S. Equal Employment Opportunities Commission (EEOC). (Compl., Dkt. #1.) The EEOC issued plaintiff a right to sue letter in July of 2019. (Id.) Plaintiff then filed her complaint in this court on October 17, 2019. In her complaint, plaintiff raised two claims under the ADA: disability discrimination and failure to accommodate. (Dkt. #1.) The parties engaged in discovery, which closed on March 19, 2021. The parties consented to trial before a magistrate judge in their joint status report on March 1, 2021, and the case was transferred to the undersigned. (Dkt. #20, #25, #26.) On April 16, 2021, Defendant filed its motion for summary judgment. (Dkt. #29.) Plaintiff filed her objection on July 7, 2021 (Dkt. #36-1), and defendant filed its reply on July 29, 2021 (Dkt. #39).

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure allows a party to move for summary judgment on any or all claims, which the court must grant "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
A material fact is one "that might affect the outcome of the
suit under the governing law." Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986). "[A]t the summary judgment stage the
judge's function is not himself to weigh the evidence and
determine the truth of the matter but to determine whether there
is a genuine issue for trial." Redd v. N.Y. State Div. of
Parole, 678 F.3d 166, 173-74 (2d Cir.2012).

The burden is on the moving party to show that it is
entitled to summary judgment. Huminski v. Corsones, 396 F.3d 53,
69 (2d Cir.2005).  The court must "construe the evidence in the
light most favorable to the non-moving party and draw all
reasonable inferences in [that party's] favor." Gary Friedrich
Enters., LLC v. Marvel Characters, Inc., 716 F.3d 302, 312 (2d
Cir. 2013).

The party opposing summary judgment "must come forward with
specific evidence demonstrating the existence of a genuine
dispute of material fact" if the movant satisfies the burden of
showing no genuine dispute of material fact. Robinson v.
Concentra Health Servs., Inc. 781 F.3d 42, 44 (2d Cir. 2015).
"The party opposing summary judgment must do more than vaguely
assert the existence of some unspecified disputed material facts
or 'rely on conclusory allegations or unsubstantiated
speculation.'" Gary v. Nordstrom, 3:18cv1402 (KAD), 2020 WL

5709632, at *1 (Sept. 24, 2020). Allegations that are "conclusory and unsupported by evidence of any weight" are insufficient for the non-moving party to withstand a motion for summary judgment. Smith v. Am. Express Co., 853 F.2d 151, 155 (2d Cir.1988).

"If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Security Insurance Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (quoting Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996), cert denied 517 U.S. 1190 (1996)).

## THE ADA CLAIMS

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Disability discrimination claims are subject to the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013). At step one, the plaintiff must establish a prima facie case of disability discrimination. If

11

the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to proffer a non-discriminatory reason for the adverse action. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993). If the defendant articulates a legitimate, non-discriminatory reason for the adverse action, the presumption of discrimination is rebutted, and the burden shifts back to the plaintiff to demonstrate that the defendant's proffered explanation for the adverse action is pretextual. Id. at 516-19.

   A. Plaintiff's Disability Discrimination Claim

   To establish a *prima facie* case of disability discrimination, plaintiff must show that: (1) the employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of the position, with or without a reasonable accommodation; and (4) she suffered an adverse employment action because of her disability. McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013); Russell v. Drivers Mgmt., LLC, No. 3:18-CV-682 (JCH), 2020 WL 7419664, at *4 (D. Conn. Feb. 11, 2020); Szuszkiewicz v. JPMorgan Chase Bank, 257 F. Supp. 3d 319, 326 (E.D.N.Y. 2017).

   Here, the parties agree that defendant is an employer subject to the ADA and that plaintiff is disabled within the meaning of the ADA. At issue is whether plaintiff was able to perform the essential functions of her position with or without

a reasonable accommodation, and if so, whether plaintiff
suffered an adverse employment action.

*1. The essential functions of the position*

As a preliminary matter, the parties disagree as to what
plaintiff needs to show to establish that she could perform the
essential functions of the position with or without an
accommodation.  The plaintiff argues that she "need only make
the minimal showing that she possesses the basic skills
necessary for performance of the job."  (Dkt. #36-1 at 6.)  In
support of this position, plaintiff cites Gregory v. Daly, 243
F.3d 687 (2d Cir. 2001).  In Gregory, the plaintiff alleged
gender discrimination and retaliation in violation of Title VII,
42 U.S.C. 2000, *et seq*.  Relying on this standard, the plaintiff
states that

> [t]here is no doubt that plaintiff was minimally
> qualified for her job as plaintiff worked for defendant
> since 2011.  Defendant has been aware of plaintiff's
> disabilities since 2011.  If plaintiff was not minimally
> qualified she would not have been hired, nor would she
> have been employed with defendant for a decade.
> Additionally, defendant's own job advertisement stating
> that Adjunct Counselors had the ability to "Choose a
> shift that best fits your lifestyle" undercuts any
> argument from defendant that the ability to work all
> three shifts is an essential element of the job.

Dkt. #36-1 at 7.)

Defendant uses a different analysis when determining
whether plaintiff can establish the third element of the *prima
facie* case. Defendant examines plaintiff's ability to perform

the so-called essential functions of the position with or
without reasonable accommodation in light of the current
limitations imposed by her disability. (Dkt. #29 at 12-14.)

The Honorable Vanessa L. Bryant dealt with a similar issue in
Desmond v. Yale-New Haven Hosp., Inc., 738 F. Supp. 2d 331, 346–
47 (D. Conn. 2010), which was a case under the Americans with
Disabilities Act. Judge Bryant noted that

> As an initial matter, the Plaintiff incorrectly
> cites *Owens v. New York City Housing Authority,* 934 F.2d
> 405 (2d Cir.1991) for the proposition that she is
> required only to establish that she "possesses the basic
> skills necessary for performance of the job" in order to
> demonstrate that she is "qualified" for the position of
> physician assistant. However, the *Owens* case involved an
> ADEA claim involving satisfactory job performance, in
> which the Second Circuit held that the "qualification"
> prong of the prima facie case may be met without regard
> to misconduct or performance problems that led to the
> plaintiff's termination. *Id.* at 409. The *Owens* standard
> is not applicable in an ADA case that requires the Court
> to determine whether a plaintiff is physically capable
> of performing the essential functions of her job with or
> without reasonable accommodation in light of her
> disability.

Id. at 346-47. Relying on McBride v. Bic Consumer Prods. Mfg.
Co., 583 F.3d 92 (2d Cir. 2009), Judge Bryant stated that the
plaintiff bears the burdens of both production and persuasion as
to the existence of an accommodation that would allow her to
perform the essential functions of her position.  Desmond, 738
F.Supp. 2d at 348.

Thus, while plaintiff's brief focuses on plaintiff's
historical ability to perform the functions of the position

(*i.e.*, before her doctor said she could no longer work third shifts due to her disability), the Court finds that the relevant inquiry is whether plaintiff could perform the essential functions of the position with or without a reasonable accommodation, in light of her disability (*i.e.*, after the doctor said plaintiff could no longer work third shifts due to her disability). This inquiry first requires the Court to determine which functions of the position are "essential."

The Second Circuit has noted that while courts are to "give considerable deference to an employer's determination as to what functions are essential," there are relevant factors that must be considered. McMillan, 711 F.3d at 126. Courts consider: "the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions." Id. (citing Stone v. City of Mt. Vernon, 118 F.3d 92, 97 (2d Cir. 1997) and 29 C.F.R. § 1630.2(n)(2)). This is a fact specific inquiry that includes the position as described and as performed, and no one element is dispositive. Id.

Defendant claims that the ability to work all shifts is an essential function of plaintiff's position. (Def.'s Mem. Supp. Summ. J., Dkt. #29 at 13.) The defendant's stated rationale is

that it operates two shelters that are open twenty-four hours per day, seven days per week, to take in domestic abuse victims at any time, and, as a result, ensuring coverage is critical. (Dkt. #29 at 4.) According to defendant, "it is essential for per diem employees to have the flexibility to work 1st, 2nd, and 3rd shifts, at least occasionally, and to be frozen in to the next shift in order to provide 24/7 coverage for the shelters."[6] (Id. at 4.) During her deposition, plaintiff also acknowledged the importance of keeping the shelters staffed twenty-four hours per day, seven days per week in case something happens. (Dkt. #30-2 at 22:15-18.)

Next, the Court will examine the relevant job description. "[I]f an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C.A. § 12111(8).  The job description for plaintiff's position contains a section titled "ESSENTIAL FUNCTIONS." (Dkt. #30-3, at 1)(caps in original

---

[6] Although the plaintiff disagrees with this statement and argues that the defendant did not need to freeze per diem employees into the next shift, the Court relies on the disputed statement as evidence of the defendant's judgment as to which functions are essential. See Martinsky v. City of Bridgeport, 814 F.Supp.2d 130, 146 (D. Conn. 2011). Defendant's explanation is not controlling, but it should be given deference. See Shannon v. New York City Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003)(a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position).

document.).  The first item listed under this section is "[p]roviding temporary program coverage for hours normally covered by a regular employee, which includes availability to work all shifts (1st, 2nd, 3rd), weekends and holidays." (Id.) Plaintiff acknowledged the receipt of this job description when she was hired in 2011. (Dkt. #30-3, at 1.)

Turning to the assessment of the job as actually performed, plaintiff acknowledged in a letter to Human Resources that she has "covered for all shifts" as part of her time with defendant. (Dkt. #30-16.) In response to defendant's Rule 56(a)(1) Statement, plaintiff also agreed that while she was covering Ms. Brown's second shifts, she could be frozen into the third shift. (Dkt. #36-2 at ¶21.) Plaintiff also admits that prior to submitting her doctor's note on September 11, 2017, there were a few times when she was frozen into the third shift after working the second shift. (Id. at ¶9.)

As for the work experience of past and current employees, the record contains testimony from plaintiff that other per diem Adjunct Counselors have been frozen into shifts. (Dkt. #30-2 at 47 and 48.) During her deposition, when plaintiff was asked if it was possible for her to get frozen into the next shift, if there was no one to cover the shift, plaintiff stated "Yeah.

That was the rule there." [7] (Dkt. #30-2 at 47:9-12.). The plaintiff has not offered any evidence of any similarly situated per diem Adjunct Counselors who were not required to be available to be frozen into the next shift.

Plaintiff argues that the ability to work all shifts and to be available to be frozen into the next shift is not an essential function of the position. In support of her argument, plaintiff relies heavily on a job advertisement that was posted in August of 2017. (Dkt. #36-6.) At the top of the page, in bold print, the advertisement says "Seeking Domestic Violence Program Adjunct Counselors" "Hiring for All Shifts." (Dkt. #36-6.) In the middle of the advertisement, also in bold print, it says "Choose a shift that best fits your lifestyle." (Dkt. #36-6.) Plaintiff argues that the fact that the advertisement states that employees can pick the shift that best fits their lifestyle "undercuts any argument from defendant that the ability to work all three shifts is an essential element of the job." (Dkt. #36-1 at 7; see also dkt. #36-2 at ¶9.) However, even when the

---

[7] **Question:** "When you were working at United Services, if someone called out for the shift after yours, is it possible that you could be frozen in if there's no one to cover?" **Answer:** "Yeah.  That was the rule there." (Dkt. #30-2 at 47:9-12.) **Question:** "And when you were working second shift at United Services, did that ever happen to you, where you had to stay on into the third shift?" **Answer:** "In my seconds, not too many times." **Question:** "A couple of times?" **Answer:** "For me. But for other people it happened. Yeah, I can't remember that.  That's like six, seven years of working. And I didn't know I was supposed to remember that." (Dkt. #30-2 at 48:15-22.)

advertisement is construed in the light most favorable to the plaintiff, it does not support plaintiff's conclusion.

First, unlike the job description (dkt. #30-3), the advertisement does not purport to contain a description or summary of the essential functions of the position. Plaintiff has not argued or offered any evidence that, after the job advertisement was posted in August of 2017, the job description (dkt. #30-3) was modified in any way to change or eliminate the first item under the "essential functions" section.

Second, being able to choose a shift that best fits an employee's lifestyle does not mean that, if hired, the employee will not be required to provide temporary coverage for an employee on another shift. Indeed, the parties agree that all per diem employees, including plaintiff, are able to pick shifts that fit their schedules from among available shifts. (Dkt. #36-2 at ¶61.) The parties further agree that those employees, including plaintiff, could still be frozen into the next shift if there was no one to cover that shift. (See Dkt. #30-2 at 47:9-12, and 48:15-22.)

In arguing that it is not an "essential function" of the position for an employee to be available to be frozen into the next shift, plaintiff relies heavily on a single sentence in the job advertisement (*i.e.*, "Choose a shift that best fits your lifestyle."). However, plaintiff has not identified any per diem

Adjunct Counselors who were not required to be available to be frozen into the next shift. There is no evidence in the record that any per diem Adjunct Counselors were exempt from being frozen into the next shift. Indeed, plaintiff has agreed that "per diem employees hired pursuant to [the] advertisement were put in the same call rotation and could still be frozen in to the next shift just like existing employees." (Dkt. #36-2 at ¶61.)  Thus, there is no evidence to support the conclusion that the job advertisement somehow implies that per diem Adjunct Counselors did not need to be available to be frozen into the next shift.[8]  The undisputed facts show that, despite the language in the job advertisement, employees who were hired before and after the advertisement was posted were placed into the same call rotation and could be frozen into the next shift.

Based on the written job description, the employer's stated rationale for the requirement, plaintiff's actual experiences, and the experiences of former and current employees, the Court finds that plaintiff has failed to raise a genuine factual dispute regarding defendant's assertion that it is an essential function of the position for a per diem Adjunct Counselor to

---

[8] Plaintiff asserts that "in some circumstances it is permissible for defendant's shelter to be closed if there was no coverage for third shift." (Dkt. #36-2 at ¶34.) Plaintiff has not provided any evidence as to how often such closings occurred or what the "circumstances" were. The assertion is insufficient to raise a material fact as to whether the alleged function is an essential function.

cover all shifts and to be available to be frozen into the next shift. In reaching this conclusion, the Court also relies on the absence of any evidence of any similarly situated per diem Adjunct Counselors who were not required to be available to work all shifts or to be available to be frozen into the next shift. *See* Martinsky, 814 F.Supp.2d 130 (D. Conn. 2011).[9]

Having found that it is an essential function of the position for per diem Adjunct Counselors to be available to be frozen into the next shift, the Court must next address whether the plaintiff could perform this essential function of the position with or without a reasonable accommodation.

Throughout her brief and her Rule 56(a)(2) Statement, plaintiff asserts that it was not necessary for defendant to freeze employees into the next shift. For example, in response to paragraph 8 of the Rule 56(a)(1) Statement, plaintiff admits "that defendant sometimes told employees that they were frozen into a shift" but denies "that defendant had to freeze employees

---

[9] In Martinsky, plaintiff argued it was not an essential function of the position for police officers, regardless of rank, to perform all of the duties of an officer with a post in patrol. Plaintiff produced evidence that officers were sometimes placed in short-term and long-term positions that did not involve patrol functions. However, the Court found that plaintiff failed to provide evidence to suggest that such placements are permanent such that the defendant "allowed an employee to maintain a position within the Department who could not perform a patrol function if required to do so." Id, 814 F.Supp.2d at 147. Here, there is no evidence that defendant temporarily or permanently exempted any per diem Adjunct Counselors from the requirement of being available to be frozen into the next shift.

into a shift." (Dkt. #36-2 at ¶8)(emphasis added). In addition to relying on the job advertisement, which has been discussed already, plaintiff argues that defendant "could have used a list of employees who were on call in the event that defendant needed coverage for a third shift if plaintiff was working a second shift." (Id. at ¶8.)  Similarly, in her brief, plaintiff notes that she "absolutely could not work third shift", but "nothing prevents her from working second shift." (Dkt. #36-1 at 2-3.) Plaintiff asserts that "[d]efendant has a per diem call list, and if plaintiff was going to be frozen into a third shift defendant could obtain coverage for plaintiff by using that call list."  (Id. at 3.) In other words, plaintiff argues that defendant could have assigned plaintiff to the second shift and exempted her from the requirement of being available to be frozen into the third shift. However, this would require the defendant to eliminate an essential function of plaintiff's position.

A modified work schedule may constitute a reasonable accommodation in certain circumstances. *See* 42 U.S.C. § 12111(9)(B)(including "part-time or modified work schedules" is within the list of methods encompassed by the term "reasonable accommodation"). However, a "reasonable accommodation can never involve the elimination of an essential function of a job." Shannon v. New York City Transit Authority, 332 F.3d 95, 100 (2d

Cir. 2003).  "Thus, 'a scheduling accommodation is not reasonable if it, in essence, requires an employer to eliminate an essential function of a job.'" Plourde v. Paulson, 236 F. App'x 656, 658 (2d Cir. 2007)(quoting Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 120 (2d Cir.2004)); Rios v. New York City Dep't of Educ., No. 03 CV 4912 (ARR)(LB), 2007 WL 9723922, at *8 (E.D.N.Y. May 16, 2007), aff'd sub nom. Rios v. Dep't of Educ., 351 F. App'x 503 (2d Cir. 2009).

Because plaintiff's proposed accommodation would, in essence, eliminate an essential function of the position, plaintiff has not established that she is capable of performing the essential functions of her position with or without a reasonable accommodation. As plaintiff admits, her doctor's note prevents her from working *any* third shifts whatsoever. (Dkt. #36-2 at ¶48.)  To be able to work the second shift and eliminate the risk of being frozen into the third shift, plaintiff would require defendant to eliminate the essential function of the position that requires per diem Adjunct Counselors to be available to be frozen into the next shift.

### 2. The Alleged Adverse Action

Plaintiff has not produced sufficient evidence to create a material question of fact that she was subjected to an adverse action. Plaintiff alleges that she suffered a reduction in work

hours because of her disability or because of her request for a reasonable accommodation.  (Dkt. #36-1 at 7.)

A reduction in work hours can constitute a materially adverse employment action. Hurt v. Donahoe, 2011 WL 10526984 (E.D.N.Y. Feb. 24, 2011) aff'd, 464 Fed. Appx. 40 (2d Cir. 2012). In support of her claim, plaintiff testified that, after plaintiff submitted her doctor's note, Ms. Victoria told her that she would only be working first shift, and she would not receive many hours. (Dkt. #36-1 at 3.) Plaintiff alleges that she suggested that defendant put someone on call so that plaintiff could work second shift and not be frozen into the third shift. (Id. at 3.)  However, Ms. Victoria said defendant could not do that. (Id. at 3.) Plaintiff asserts that ultimately, she worked fewer hours and lost income. (Id. at 4.) Plaintiff asserts that her W-2 statements for 2017 and 2018 show that she actually worked fewer hours after requesting a reasonable accommodation. (Id. at 7.)

It is unclear whether plaintiff is claiming that she worked fewer hours because of defendant's decision not to assign her to the second shift or whether she is claiming that defendant intentionally reduced her hours on the first shift.  If the plaintiff is claiming the former, the Court has already addressed this allegation indirectly while discussing the essential functions of the position. The Court has determined

that being available to be frozen into the next shift is an
essential function of the position.  It is undisputed that
plaintiff could not work any part of a third shift. (Dkt. #36-2
at ¶48.) Plaintiff admits that when she worked second shifts,
she could be frozen into the third shift, and there were a few
times when this happened. (Dkt. #36-2 at ¶9 and ¶21; Dkt. #30-2
at 47:9-12.) Thus, the Court finds that the decision to stop
scheduling plaintiff for the second shift, in order to eliminate
the risk of plaintiff getting frozen into the third shift, was
not an adverse action. Plaintiff has failed to raise a genuine
factual dispute that this was an adverse action.

Alternatively, if the plaintiff is claiming that the
defendant intentionally reduced her hours, separate and apart
from failing to schedule her for the second shift, plaintiff has
failed to produce sufficient evidence to support such an
allegation.  Although plaintiff's W-2 forms show a decrease in
income, no evidence has been produced that the alleged decrease
was due to any wrongful conduct by the defendant.

It is undisputed that defendant uses a call rotation list
to determine the order in which per diem employees are offered
shifts. (Dkt. #36-2 at ¶17.)  Plaintiff has not offered any
evidence that defendant strayed from the call rotation system.

Additionally, it is undisputed that plaintiff "has turned
down several first shifts since she notified [defendant] of her

medical restrictions." (Dkt. #36-2 at ¶55.)  Plaintiff receives Social Security Disability Insurance ("SSDI") benefits, and defendant is required to certify on, on an annual basis, the amount of income that plaintiff earns per month. (Dkt. #36-2 at ¶25 and ¶26.) Plaintiff's income had to be under a certain amount to remain eligible for SSDI benefits. (Id. at ¶26.) "On several occasions since September 2017, [plaintiff] has tried to change her shifts or leave early from shifts that she had already accepted because she cannot go over the Social Security Disability cap." (Dkt. #36-2 at ¶55.) Defendant allowed plaintiff to leave early or work partial shifts when possible. (Dkt. #36-2 at ¶55.) It follows that the number of hours worked would necessarily decrease if plaintiff turned down shifts or voluntarily left shifts early to avoid exceeding the cap on SSDI benefits.

Thus, although plaintiff attempts to rely on the temporal proximity between her request for a reasonable accommodation and her decrease in hours to establish a link between the two events, she has offered no evidence to show what, if anything, defendant supposedly did to decrease her hours, other than stop scheduling her for second shifts.

Plaintiff has failed to establish a *prima facie* case of disability discrimination.[10]  However, even if plaintiff's evidence is sufficient to establish a *prima facie* case of disability discrimination, summary judgment would be appropriate because plaintiff has failed to raise a genuine issue of fact that the defendant's explanation is pretextual.

> *3. The Legitimate, Non- discriminatory Reason*

Assuming *arguendo* that plaintiff could establish a *prima facie* case of disability discrimination, defendant has articulated a legitimate, non-discriminatory reason for the decision to stop scheduling plaintiff for second shifts.  More specifically, defendant argues that it is an essential function of the position for a per diem Adjunct Counselor to be available for all shifts and to be available to be frozen into the next shift if the employee who is scheduled for that shift calls out or fails to show up.  Since plaintiff's disability prevents her from working any portion of a third shift and there was a risk that plaintiff could get frozen into a third shift if she worked second shift, defendant asserts that it removed plaintiff from second shifts to eliminate the risk of plaintiff getting frozen into a third shift. (Dkt. #29 at 14 and 18.) In essence,

---

[10]  Plaintiff's brief does not explicitly address the fourth factor of the <u>McDonnell Douglas</u> test (circumstances giving rise to an inference of discrimination). However, the Court notes that plaintiff has not provided evidence of any similarly situated comparators who were not required to be available to be frozen into the next shift.

defendant argues that the decision was not an adverse action, it was part of the reasonable accommodation.

### 4. Pretext

The plaintiff has failed to raise a genuine issue of fact that the defendant's explanation is pretextual. As discussed above, to the extent that the plaintiff claims that defendant's decision to stop scheduling plaintiff for second shifts was discriminatory, the Court has already concluded that it is an essential function of the per diem Adjunct Counselor position to be available to be frozen into the next shift.  It is undisputed that plaintiff could not work any portion of a third shift. Under defendant's policy, if plaintiff worked second shift, she could be frozen into the third shift. Plaintiff has proposed solutions that would require defendant to eliminate an essential function of the position.  However, she has not demonstrated that defendant's explanation for not scheduling her for the second shift was pretextual.

Additionally, assuming the temporal proximity between plaintiff's request for an accommodation and her reduced work hours is sufficient to establish a *prima facie* case of discrimination (separate and apart from defendant's failure to schedule her for the second shift), plaintiff has failed to show that the explanation for the decrease in hours is false or unworthy of belief.  Defendant argues that the reduction in

hours was due to plaintiff's conduct (turning down shifts and leaving early to avoid exceeding the cap for SSDI).  Plaintiff has not submitted any evidence to show that this explanation is false.  Instead, the pretext section of plaintiff's brief argues that defendant could have found ways to prevent plaintiff from being frozen into the third shift had defendant scheduled plaintiff for the second shift.  However, as noted, this would require defendant to eliminate an essential function of the position.

As a result, defendant's motion for summary judgment is granted on the disability discrimination claim.

B. The Claim for Failure to Accommodate

To establish a claim for failure to accommodate, plaintiff must show that: 1) she has a disability within the meaning of the ADA; 2) the employer is covered by the ADA and had notice of the disability; 3) plaintiff could perform the essential functions of the job with reasonable accommodations[11]; and 4) the employer refused to make the accommodations. Noll v. Int'l Business Machines Corp., 787 F.3d 89, 94 (2d Cir. 2015). The Court conducts a fact-specific inquiry as to whether the employer's accommodations are reasonable. Id.

---

[11] As discussed above, the Court has found that plaintiff has not shown that she could perform the essential functions of the position with or without a reasonable accommodation.  Nevertheless, the Court will analyze the failure to accommodate claim.

Under the ADA, a reasonable accommodation includes "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position . . . is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). The crucial factor as to whether an accommodation is reasonable is whether the accommodation is effective; "employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee" as long as the accommodation is effective.  Noll, 787 F.3d at 95. The discretion to choose between effective accommodations lies with the employer. Id.

And "in a case such as this, in which the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" Id. There is no further duty to assess whether the employee's requested accommodations would have been reasonable. Id. (citing U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 400-02 (2002)).

"As noted earlier, a modified work schedule may constitute a reasonable accommodation in certain circumstances. A reasonable scheduling accommodation "should 'eliminat[e] the conflict between' the employer's scheduling requirements and the

30

employee's needs, without imposing 'a significant work-related burden on the employee without justification.'" Cormier v. City of Meriden, 420 F.Supp.2d 11, 19 (D. Conn. 2006) (quoting Cosme v. Henderson, 287 F.3d 152, 159 (2d Cir. 2002). But "[a] reasonable accommodation can never involve the elimination of an essential function of the job." Shannon v. New York City Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003).

The Honorable Janet Bond Arterton applied and analyzed these principles in Cormier v. City of Meriden, 420 F.Supp.2d 11 (D. Conn. 2006). In Cormier, plaintiff Cormier was employed as a public safety dispatcher. Dispatchers worked 39 hours per week in eight-hour shifts.  Overtime was scheduled two weeks in advance but could occur at any time. Id. at 14. Normal overtime was scheduled in eight-hour increments, but overtime was also scheduled in four-hour increments due to vacations or sick time. Id.  Under the collective bargaining agreement, a voluntary overtime list was compiled, and dispatchers were contacted in the order they appeared on the list. Id. Dispatchers who accepted voluntary overtime were required to accept at least four hours of a shift. Id.  If a dispatcher's replacement failed to show up, that dispatcher was required to remain on the job until he or she was relieved to ensure that three dispatchers were on the job at all times. Id. at 14-15.

Cormier notified her supervisor that she was diagnosed with multiple sclerosis and was unable to work twelve hours continuously.  Id. at 15. In response, the defendant City of Meriden issued a memorandum placing certain restrictions on Cormier's overtime.  One of the City's concerns was that if Cormier was assigned to an eight-hour overtime shift immediately before or after her regular shift, and Cormier was unable to find a replacement for four hours of that shift, it would potentially violate the medical restriction. Id. at *16. Cormier brought a claim for failure to accommodate.  Judge Arterton found that

> The only evidence in the record shows that the City offered Cormier the ability to bid on essentially all overtime shifts that would not pose a risk of violating her medical restrictions, and she refused this accommodation.  The limitation in the City's proposal was that Cormier could not bid on contiguous 8-hour shifts.  This accommodation successfully strikes a balance between the employer's need for three dispatchers on duty at all times and Cormier's medical restriction; there would have been no risk of Cormier exceeding her 12 consecutive work hour medical limitation under the City's plan.

Id. at 20.  The Court noted that "Cormier appears to argue that the plan was unreasonable because it burdened her ability to earn overtime income, but she has not provided any evidence showing the impact of the City's proposal on her ability to earn overtime income." Id. at 20.  The Court stated that the employer providing the accommodation has the ultimate discretion to

choose between effective accommodations. Id. at 21. Finally, the Court noted that "the ADA does not necessarily entitle plaintiff to her preferred accommodations as long as the offered one does not create a significant burden on her."  Id. at 21. The Court granted the City's motion for summary judgment.

In the instant case, the defendant argues that plaintiff cannot establish a failure to accommodate because the defendant accommodated the concern that plaintiff's doctor raised. Since plaintiff's disability prevented her from working any part of a third shift, defendant responded by taking plaintiff off third shifts. Defendant also took plaintiff off second shifts to eliminate the risk of her getting frozen into the third shift.

Because defendant offered accommodations, the Court needs to consider whether the accommodations were "plainly reasonable."  Given the doctor's note, it was plainly reasonable for the defendant to stop scheduling plaintiff for third shifts, and plaintiff does not argue otherwise. (Dkt. #30-2; Pl.'s Local Rule 56(A)(2), Dkt. #36-2 at ¶49.) Plaintiff argues that it was unreasonable for defendant to remove her from the second shift. Plaintiff has not demonstrated that the consequence of being taken off second shift are so great that the Court would have to infer that defendant's accommodation is unreasonable. See Cormier, 420 F. Supp. 2d at 20 (D. Conn. 2006)("Plaintiff's failure to offer evidence of the consequence of some overtime

being off-limits to her under the City's proposal compared to her own proposal, from which it could be inferred that the City's proposal was unreasonable, dooms her *prima facie* case.")

Plaintiff has not demonstrated that it is a significant work-related burden to limit her to first shifts.  The defendant's solution strikes a balance between the employer's need to ensure twenty-four hour per day coverage and plaintiff's medical restrictions. In a workplace such as the defendant's workplace, where it is imperative to maintain twenty-four hour shift coverage, freezing an employee into the next shift is a plausible way to ensure coverage if no one on-call agrees to cover the shift. Plaintiff admits to being frozen into shifts in the past and admits that other employees were also frozen into shifts. (Dkt. #30-2 at 47-48; Dkt. 36-2 at ¶9 and ¶21).  As noted earlier, there is no evidence that any per diem Adjunct Counselors were exempt from the obligation to make themselves available to be frozen into the next shift.  The evidence in the record shows that the ability to be frozen into the next shift is important to keep the shelter open. Since the plaintiff cannot work any part of the third shift, it was plainly reasonable for defendant to stop scheduling her for the second shift to eliminate the risk of freezing plaintiff into the shift that her disability prevented her from working (third shift).

The only evidence in the record that would support
plaintiff's argument that it was unreasonable for defendant to
take her off the second shift is plaintiff's decrease in pay
from 2017 to 2018. But plaintiff does not rely on the evidence
of the decrease in pay to demonstrate that the accommodation of
removing her from second shift was unreasonable. Instead, she
relies on the decrease to argue that she suffered an adverse
employment action as part of her disability discrimination
claim.  The fact that plaintiff made less money between 2017 and
2018 does not demonstrate that the accommodation of removing
plaintiff from the second shift was unreasonable. Plaintiff has
not demonstrated how much money she lost due to the removal from
the second shift, as opposed to the removal from the third
shift. Plaintiff lost a total of $3,848 between 2017 and 2018.
(Dkt. #36-7.) This is not an unreasonable decrease in salary
considering that the third shifts (in whole or in part) were
unavailable to plaintiff.

Even when the facts are construed in the light most
favorable to plaintiff, the undisputed facts in the record
demonstrate that plaintiff turned done several first shifts
since notifying defendant of her medical restrictions, she tried
to leave early from scheduled shifts, or terminated shifts she
had accepted.  Although plaintiff does not address the
situation, these undisputed facts suggest that some portion of

the decrease in hours was due to plaintiff's own conduct.[12] (Dkt. #36-2 at ¶55.) Because of the reasonableness of the accommodation and plaintiff's failure to demonstrate that the decrease in salary is beyond what would be expected for a shift restriction accommodation, plaintiff has failed to demonstrate that defendant's accommodation of removing plaintiff from the second shift was unreasonable.

Taken as a whole, defendant's decision to stop scheduling plaintiff for the third shifts is a reasonable accommodation, as was the decision to stop scheduling plaintiff for the second shift to avoid the risk of having her get frozen into the third shift.

Further, it is undisputed that defendant also offered plaintiff the opportunity to work as a per diem employee in another department that does not have third shifts. (Dkt. #36-2 at ¶40.) This proposed accommodation would have allowed plaintiff to work first and second shifts without any risk of being frozen into third shifts. (Id. at ¶40.) It is undisputed that plaintiff rejected this offer outright, stating that she would only work in the Domestic Violence Program. (Id. at ¶40.) Plaintiff has not provided any explanation as to why defendant's

---

[12] Plaintiff agrees with the allegations in paragraph 55 of defendant's Rule 56(a) Statement. (Dkt. #36-2 at ¶55.)  Yet, plaintiff does not attempt to indicate what portion of the $3,848 loss was attributable to her own conduct.

offer to accommodate her disability in such a manner was unreasonable or would have created a significant burden on her. See Cormier, 420 F.Supp.2d 21 ("the ADA does not necessarily entitle plaintiff to her preferred accommodations as long as the offered one does not create a significant burden on her.")

Plaintiff has failed to raise a genuine issue of fact as to her failure to accommodate claim. Therefore, the defendant is entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Def.'s Motion for Summ. J., dkt. #28) is GRANTED.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. See 28 U.S.C. § 636(c)(3).

SO ORDERED this 30th day of **September**, 2022 at Hartford, Connecticut.

/s/
_____

Robert A. Richardson
United States Magistrate Judge
